**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| **BIRGETTA CLAY and CANDICE MCINTRYE,** individually and on behalf of all others similarly situated, <br><br> *Plaintiffs,* <br><br> v. <br><br> **KLARNA INC.,** <br><br> *Defendant.* | CLASS ACTION COMPLAINT <br><br> Case No. 26-3506 <br><br> <u>DEMAND FOR JURY TRIAL</u> |

## <u>INTRODUCTION</u>

1.      Plaintiff Birgetta Clay is a retired grandmother raising two grandchildren on a fixed Social Security income while carrying credit-card and auto-loan debt.

2.      Plaintiff Candice McIntyre raised three children on a minimum-wage income and struggles to meet existing obligations, including student loans and credit-card debt.

3.      When Candice and Birgetta turned to Klarna to help finance purchases, Klarna approved them for a revolving "purchasing power" they could use again and again. Klarna did not know about Plaintiffs' financial circumstances because it did not ask. It did not ask how much they earned, it did not evaluate their existing obligations, and it did not determine whether they had the ability to take on and repay additional debt.

4.      That was not a mistake; it is Klarna's business model. Klarna's non-existent underwriting has drawn public scrutiny for years—and intensified when

1

Klarna began financing DoorDash food-delivery orders, a practice commentators derided as "C.D.O.s," or "Collateralized DoorDash Obligations."

5. Instead of screening out unaffordable lending through underwriting, Klarna reduced its own risk by requiring—for many purchases—that consumers agree in advance to automatic withdrawals from their bank accounts.

6. In other words, Klarna replaced underwriting with the right to pull payments directly from consumers' accounts. It extended reusable credit without determining whether its consumers had any ability to repay, then positioned itself to collect first by reaching directly into consumers' accounts when payments came due.

7. That gave Klarna contractual priority over Plaintiffs' other obligations and stripped them of the ability to decide, when money was short, whether limited funds should go first to rent, groceries, medicine, utilities, or other debts before Klarna took its payment.

8. That practice is especially irresponsible because Klarna's users are disproportionately financially vulnerable. Klarna users are far more likely to have subprime, deep subprime, or no credit scores at all. BNPL users more broadly experience higher levels of financial stress, including elevated delinquency rates on other forms of debt. Yet Klarna, in predatory fashion, extends replenishable credit to these consumers and secures repayment priority for itself.

9. The consequences are all too predictable. When financially strained consumers are given reusable credit without meaningful underwriting and then

2

required to repay automatically, missed payments, overdraft fees, late fees, and deeper debt are inevitable.

10. That is exactly what happened here. Plaintiffs missed payments, were assessed late fees, incurred overdraft charges, and accumulated additional debt, all while falling deeper and deeper into financial distress.

11. These harms are not new. They are the kind of harms Congress has long recognized and addressed through federal consumer-protection statutes.

12. The Truth in Lending Act ("TILA") and its implementing regulations require lenders offering open-end credit to assess a consumer's ability to make required payments before opening an account or increasing available credit. Klarna does not do so. It gives consumers replenishable credit for repeated use without even so much as inquiring about income, much less assessing ability to repay as the law requires.

13. The Electronic Funds Transfer Act ("EFTA") prohibits a creditor from conditioning the extension of credit on repayment by preauthorized electronic fund transfer. Klarna nevertheless regularly conditions the extension of credit on consumers' agreement to autopay.

14. Plaintiffs bring this action on behalf of themselves and a nationwide class of similarly situated consumers for Klarna's violations of TILA, EFTA, and the Illinois Consumer Fraud and Deceptive Business Practices Act.

## JURISDICTION AND VENUE

15.     This Court has personal jurisdiction over Klarna because Klarna has conducted and continues to conduct business in the State of Illinois, and because Klarna has committed the acts and omissions complained of in the State of Illinois.

16.     This court has subject matter jurisdiction pursuant to the Class Action Fairness Act, 28 U.S.C. 1332(d), as Plaintiffs (Illinois) and Klarna (Ohio) are diverse, there are over 100 class members, and the amount in controversy exceeds $5 million.

17.     Venue is proper in the Northern District of Illinois, because a substantial portion of the acts giving rise to this action occurred in this district.

## PARTIES

18.     Plaintiff Birgetta Clay is, and at all times mentioned was, an individual citizen of the State of Illinois. At all material times, she was a resident of Cook County.

19.     Plaintiff Candice McIntrye is, and at all times mentioned was, an individual citizen of the State of Illinois. At all material times, she was a resident of Madison County.

20.     Defendant Klarna Inc., is the U.S. subsidiary of Klarna Group plc, an English corporation. Klarna Inc. is a Delaware corporation with its principal office located at 800 N. High St., Ste. 400, Columbus, Ohio 43215. It is one of the largest BNPL providers in the United States.

4

## FACTUAL ALLEGATIONS

**I. Klarna's BNPL business model is to encourage overspending through non-existent underwriting coupled with mandatory autopay.**

**A. Klarna's BNPL credit products are designed to induce consumers to spend beyond their means.**

21. Klarna is one of the largest buy-now-pay-later ("BNPL") providers. In 2024, Klarna facilitated approximately $105 billion in gross merchandise volume ("GMV") and served roughly 93 million active consumers through a network of more than 675,000 merchants across 26 countries.[1]

22. Klarna offers consumers two primary BNPL products. First, its "Pay Later" products allow consumers to buy now and repay later, often through short-term installments, including "Pay in 4." Second, its "Fair Financing" products allow consumers to repay over a longer period and may include interest.[2]

23. Klarna's "Pay Later" products are the core of its BNPL business and account for the vast majority of its GMV. "Fair Financing" is a smaller share.[3] Together, these products are the engine of Klarna's consumer-facing business.

24. Klarna makes money from those products in several ways. It earns interest on longer-term financing plans, charges late fees, charges merchants to offer Klarna at checkout, and bundles and sells loans it originates to third-party investors.

---

[1] Klarna Group plc, *Registration Statement* (Form F-1) ("Klarna F-1"), at 5, 25 (Mar. 14, 2025), available at https://www.sec.gov/Archives/edgar/data/2003292/000162828025012824/klarnagroupplcf-1.htm.

[2] *Id.* at 169.

[3] *Id.*

25. Klarna's primary source of revenue, however, is merchant fees.[4] Merchants pay Klarna to offer BNPL at checkout because BNPL is designed to increase conversion and increase basket size: consumers are more likely to complete a purchase, and they often spend more, when the price is broken into installments.[5]

26. Klarna says exactly that in its own marketing materials.[6] Klarna claims that offering Klarna at checkout increases purchase completion by 44%, increases order values by 68%, and increases purchase frequency by 20%.[7] Klarna is not just selling a new way to process payments; it is selling merchants a tool to drive more sales.

27. Klarna has also monetized its longer-term, interest-bearing receivables by bundling and selling portions of its "Fair Financing" portfolio.[8] In late 2025, Klarna announced that it was selling $6.5 billion in "Fair Financing" plans to Elliott Investment Management.

28. That "originate-and-sell" model eerily resembles the pre–Great Recession subprime mortgage strategy: originate risky loans, then offload the risk.

---

[4] *Id*. at 7, 123, 141-42.

[5] Julia Cook et al., B*uy Now Pay Later Services as a Way to Pay: Credit Consumption and the Depoliticization of Debt*, 26 Consumption Mkts. & Culture 245, 246 (2023), at 247 (BNPL services are marketed to prospective merchant partners on the basis that their use reduces 'cart abandonment'..."), available at: https://www.tandfonline.com/doi/full/10.1080/10253866.2023.2219606#d1e361.

[6] *Klarna Deep Dive*, Klarna.com (Jan. 21, 2020), available at https://owp.klarna.com/legacy/-assets/sites/2/2020/01/21085652/klarna-deep-dive.pdf.

[7] *Id*. at 2, 4-6.

[8] Klarna, *Klarna Powers Fair Financing Hypergrowth with $6.5bn US Agreement*, available at https://investors.klarna.com/News--Events/news/news-details/2025/Klarna-Powers-Fair-Financing-Hypergrowth-with-6-5bn-US-Agreement-f9ec92233/ (Nov. 18, 2025).

The risk is especially serious here because Klarna does little or no meaningful underwriting before extending credit to consumers who often cannot afford additional debt.

**B. Klarna gives all users a replenishable "purchasing power" without assessing their ability to repay.**

29. Consumers typically use Klarna by creating an account in the Klarna app or by selecting Klarna at checkout with a participating merchant.[9] To sign up for the Klarna app, a consumer generally provides basic identifying information, such as name, address, date of birth, and Social Security number.

30. Klarna does not ask about the consumer's income, and it performs only a soft credit check.[10] Yet Klarna promptly assigns all users a "purchasing power"—a limited but replenishable amount of credit that the user can draw on to make purchases through Klarna:

 

---

[9] Klarna F-1, *supra* note 1, at 5.

[10] Klarna, *Does Klarna Perform a Credit Check and Will This Affect My Credit Score?*, available at https://www.klarna.com/us/help/products-and-services/does-klarna-perform-a-credit-check-and-will-this-affect-my-credit-score/ (last visited March 23, 2026).

31.     Like other BNPL providers, Klarna uses a "low-and-grow" model: it starts consumers with a limited amount of available credit and increases that amount over time if they make on-time payments.[11] As Klarna explains it: "We also provide a small spending capacity to consumers that gradually increases as consumers responsibly spend more with Klarna."[12]

32.     Klarna does not set a user's purchasing power by considering or evaluating income against existing obligations. Instead, Klarna's purchasing power is "based on factors such as your payment history with Klarna and your outstanding balance."[13] Klarna also relies on "purchase behavior from an average of approximately 2.9 million transactions per day made by 93 million active Klarna consumers[.]"[14]

33.     A user can increase their purchasing power by "always paying on time and making payments towards your outstanding purchases[.]"[15] When deciding whether to increase a user's purchasing power, Klarna also considers "proprietary data," including "Klarna history and purchase behavior of our active Klarna customers."[16]

---

[11] Consumer Fin. Prot. Bureau, *Buy Now, Pay Later: Market Trends and Consumer Impacts* (Sept. 2022) ("CFPB 2022"), at 19, available at https://files.consumerfinance.gov/f/documents/cfpb_buy-now-pay-later-market-trends-consumer-impacts_report_2022-09.pdf.

[12] Klarna F-1, *supra* note 1, at 9.

[13] Klarna, *How Much Am I Eligible to Spend?*, https://www.klarna.com/us/customer-service/how-much-am-i-eligible-to-spend/ (last visited Mar. 23, 2026).

[14] Klarna F-1, *supra* note 1, at 45, 138.

[15] Klarna, *How Much Am I Eligible to Spend?*, supra note 13.

[16] *See* Klarna F-1, *supra* note 1, at 45.

34.     In practice, Klarna's substitute for recognized and established underwriting practices is not a meaningful review of consumer ability to repay. Klarna intentionally does not ask its consumers to provide income information; instead, Klarna requests and considers only the user's repayment history and other undisclosed "proprietary data[.]"[17]

35.     Once a user is assigned purchasing power, the user is free to spend up to that amount so long as the user remains current on existing Klarna obligations.[18] Klarna mischaracterizes this as "underwriting" each transaction in real time, but in reality, Klarna instantly approves all transactions so long as it fits within the user's purchasing power and the user is current on other Klarna obligations.

36.     The nominal nature of Klarna's "underwriting" is further shown by how it increases a user's purchasing power. When a user stays current on existing Klarna obligations, Klarna not only allows that user to keep drawing on existing purchasing power—it also ***increases*** the user's purchasing power.[19] Klarna does so without asking whether the user's income has increased or other obligations have decreased. The inquiry is wholly divorced from the user's ability to repay, it is solely based on whether the user is current on Klarna debt. If so, Klarna extends more credit. That is "underwriting" in name only.

---

[17] *Id.*

[18] The one caveat is that Klarna's purchasing power is not always usable in a single transaction or at a single merchant; merchant-specific caps may apply depending on Klarna's arrangements with particular merchants. But consumers can still make purchases within their overall purchasing power across multiple transactions and merchants with Klarna generally.

[19] Klarna, *How Much Am I Eligible to Spend?*, supra note 13.

37. This explains why BNPL lenders like Klarna approve purchases at approximately 73%—nearly double the approval rate for credit cards.[20]

38. This model is especially risky because Klarna's user base is disproportionately financially vulnerable. Increasingly, consumers are using Klarna to finance everyday necessities, like groceries. Klarna has even partnered with DoorDash to allow users to finance fast-food delivery purchases. When a consumer is forced to finance a burrito, it almost certainly means they are under extraordinary financial strain. A company extending replenishable credit to that consumer should first determine whether the consumer can repay it.

39. Moreover, because Klarna generally performs only a soft credit check, a consumer's BNPL obligations may not be visible to other credit issuers or other BNPL providers. That makes it easier for consumers to stack BNPL debt across multiple providers at the same time.[21]

**C. Klarna's solution to risky lending is compulsory autopay.**

40. Klarna extends easy-to-access credit to anyone who joins the platform. Much of that credit is risky because Klarna's users are disproportionately financially vulnerable. They are more likely to be financially stressed, to carry existing debt, and to fall behind on other obligations.

41. Klarna ensures that its users will repay their debts by mandating they agree to authorize Klarna to automatically withdraw payments from their accounts.

---

[20] CFPB 2022, supra note 11, at 9.

[21] *Id.* at 19, 64-69.

42. This compulsory autopay is especially prevalent in Klarna's "Pay in 4" product—its most widely used BNPL offering. Klarna frequently offers only its "Pay in 4" product at checkout. To complete those purchases, consumers must accept Klarna's "Pay in 4" Agreement.[22] That Agreement makes autopay a condition of credit. It states:

> You must agree to the terms of this Agreement, including the Payment Authorization below that authorizes us to initiate payments from the debit card, credit card, or bank account you have identified, in order to obtain a Pay in 4 loan.[23]

43. This practice is improper because it strips consumers of control over their own funds, especially when money is tight. A consumer facing a financial emergency may need to prioritize rent, groceries, medicine, utilities, or other essentials. Mandatory autopay takes that choice away.[24]

44. Mandatory autopay also exposes consumers to late fees, overdraft fees, and potential collection activity when Klarna attempts a withdrawal. Klarna itself charges late fees of up to $7. [25]

45. Klarna thus extends easy-to-access, risky credit to consumers it knows—or should know—are financially vulnerable, then gives itself contractual priority over those consumers' limited funds.

---

[22] Klarna Pay in 4 Agreement (July 22, 2025) (attached as Ex. A).

[23] *Id.* at 2.

[24] CFPB 2022, *supra* note 11, at 21-22, 64-69, 74.

[25] Carol Pope, *Klarna Buy Now, Pay Later Review*, LendingTree (Sept. 4, 2025), available at https://www.lendingtree.com/personal/klarna-review/.

## II. Klarna's non-existent underwriting and mandatory autopay predictably cause widespread consumer harm.

46. As BNPL use has surged, the costs have unsurprisingly fallen on the consumers least able to bear them. Klarna and its peers extend easy-to-access credit to financially vulnerable consumers, then lock those consumers into automatic withdrawals that strip them of the ability to prioritize essentials when money is tight.[26]

47. The result is not just the debt that consumers struggle to repay. Reports and studies increasingly show BNPL users being forced to forgo essentials in order to keep up with BNPL payments and the fees that follow missed payments.

48. Klarna's practices—lax "underwriting" and mandatory autopay—contribute directly to that harm.

### A. BNPL users are disproportionately financially vulnerable.

49. Klarna's underwriting practices are especially egregious because BNPL users are disproportionately financially vulnerable: the credit-invisible,[27] borrowers

---

[26] Klarna's practices are typical of the BNPL industry. As the CFPB has explained, "[t]he standard practice for BNPL lenders" is to rely on underwriting based on a soft credit pull "that is not visible to other lenders and does not impact a consumer's credit report or scores." CFPB 2022, *supra* note 11, at 16. BNPL providers also commonly employ a "low-and-grow" strategy: extending limited credit to first-time borrowers and gradually increasing available credit as the borrower exhibits positive repayment behavior. *Id.* at 19. And many BNPL providers mandate autopay (to varying degrees). *Id.* at 22.

[27] "Credit invisible" refers to approximately 26 million U.S. consumers who lack a credit history with major bureaus (Equifax, Experian, TransUnion), making them "invisible" to lenders and unable to generate a credit score.

with subprime or deep-subprime credit scores, younger consumers, and consumers of color.[28]

50.     Consumers with subprime or deep-subprime credit scores account for nearly two-thirds of BNPL originations.[29] Another study found that 69% of BNPL users had subprime or near-prime credit scores.[30]

51.     BNPL users also carry more debt than non-users. They are more likely to have credit-card, retail-card, personal-loan, auto-loan, and student-loan debt, and they tend to carry higher balances in each category.[31] They are also more likely to be delinquent on those obligations and twice as likely to have a negative credit-card balance.[32]

52.     BNPL users have less financial cushion. On average, they hold roughly one-quarter the savings of non-BNPL users, and about 25% report having no savings at all.[33]

---

[28] Consumer Fin. Prot. Bureau, *Consumer Use of Buy Now, Pay Later and Other Unsecured Debt*, at 3, 14, (Jan. 2025) ("CFPB Jan. 2025"), available at https://www.consumerfinance.gov/data-research/research-reports/consumer-use-of-buy-now-pay-later-and-other-unsecured-debt/.
[29] *Id.* at 6.

[30] Jennifer Chien, Buy Now, Pay Later: Policy Measures to Mitigate Consumer Risks from Evolving Business Practices, Consumer Reports (July 20, 2023) ("Consumer Reports"), at 12-16, available at https://advocacy.consumerreports.org/wp-content/uploads/2023/07/BNPL-Policy-White-Paper.pdf.

[31] Consumer Fin. Prot. Bureau, *Consumer Use of Buy Now, Pay Later: Insights from the CFPB Making Ends Meet Survey*, (March 2023) ("CFPB 2023"), available at https://files.consumerfinance.gov/f/-documents/cfpb_consumer-use-of-buy-now-pay-later_2023-03.pdf; *see also* Felix Aidala, Daniel Mangrum & Wilbert van der Klaauw, *How and Why Do Consumers Use "Buy Now, Pay Later"?*, Fed. Rsrv. Bank N.Y.: Liberty St. Econ. (Feb. 14, 2024), available at https://libertystreeteconomics.-newyorkfed.org/2024/02/how-and-why-do-consumers-use-buy-now-pay-later/.

[32] Consumer Reports, *supra* note 29, at 12-16.

[33] *Id.*

53. BNPL users also show clearer signs of financial distress. BNPL users are more likely to rely on alternative financial services such as payday loans and pawn loans, and more likely to incur overdraft fees.[34] Financially vulnerable households are four times more likely to use BNPL.[35]

54. Even these figures likely understate the problem. Many studies rely on data from nationwide consumer reporting agencies, which exclude credit-invisible consumers. As a result, the extent to which BNPL is used by—and strains—borrowers outside the traditional credit system is likely understated.[36]

## B. Klarna easy-to-access credit encourages over indebtedness by design.

55. Despite its fragile consumer base, Klarna offers easy to access, replenishable credit with no underwriting and, for many products, conditions that credit on mandatory autopay. The result is predictable: over-indebtedness.

56. Consumers themselves say they use BNPL to buy what they otherwise could not afford. In one study, the most common reason for using BNPL was "to make a purchase that otherwise wouldn't fit my budget." In another, respondents said: "I didn't have enough money to purchase what I wanted, so this enabled me to afford it."[37]

---

[34] CFPB Jan. 2025, *supra* note 27, at 6.

[35] Consumer Reports, *supra* note 29, at 14-15.

[36] CFPB 2023, *supra* note 30, at 5 (limiting the survey's scope to a random sample of consumers with a credit record maintained by a NCRA).

[37] Consumer Reports, *supra* note 29, at 16.

57. More troubling, BNPL is increasingly used not for discretionary purchases, but for basic living expenses—groceries, gas, utilities, and medical care.[38]

58. When consumers are extended credit they cannot reasonably repay, missed payments follow. Fourteen percent of BNPL users report missing at least one payment; twelve percent report missing more than one.[39] Financially vulnerable users are three times more likely to struggle with repayment.

59. The repayment problem is especially visible when consumers first begin using BNPL. Rather than improving their finances, new users experience significant increases in overdraft fees, credit-card interest, and other delinquency-related charges.[40]

60. Mandatory autopay makes these harms worse. When a financially fragile consumer faces an emergency, they may need to prioritize rent, food, or utilities over a short-term BNPL installment. By requiring automatic withdrawals as a condition of credit, Klarna takes that choice away.

61. That practice can trap consumers in debt cycles, forcing them to miss other obligations and cut back on essentials.[41] Research from the Australian

---

[38] *Consumers Embrace BNPL for Groceries Amid Rising Food Costs*, PYMNTS (June 12, 2024), available at https://www.pymnts.com/buy-now-pay-later/2024/consumers-embrace-bnpl-groceries-amid-rising-foodcosts/; *Welcome to the Easy Way to Pay Your Medical Bill*, WellNow Urgent Care (last visited March 23, 2026), https://www.wellnow.com/sezzle/ (advertising how WellNow's patients can pay for their urgent care visits with a Sezzle BNPL loan).

[39] Consumer Reports, *supra* note 29, at 64-69.

[40] *Id*.

[41] CFPB 2022, *supra* note 11, at 67-69.

Securities and Investments Commission found that 20% of BNPL users cut back on essential items to make BNPL payments, and 15% took out additional loans to cover BNPL obligations.[42] In the United States, 32% of respondents reported delaying or skipping an essential bill because of BNPL payments.[43]

62. Studies also indicate that consumers prioritize BNPL payments over auto loans, credit cards, and even mortgage obligations.[44] And this is happening at the same time delinquencies are rising across other major credit categories, including auto loans, student loans, mortgages, and credit cards.[45] As the Federal Reserve put it, "delinquencies on credit cards and auto loan debt increased to levels not observed since the Great Financial Crisis (GFC)[.]"[46]

63. These harms are compounded by the fact that BNPL providers often do not report BNPL loans to consumer reporting agencies and frequently rely only on soft credit inquiries.[47] Other lenders therefore do not see those obligations, and consumers can stack multiple BNPL plans across providers.[48]

---

[42] *Id.*

[43] *Id.*

[44] *Id.*

[45] *See* Fed. Rsrv. Bank of N.Y., *Household Debt Balances Grow Modestly; Early Delinquencies Level Out for Non-Housing Debts* (Feb. 10, 2026), available at https://www.newyorkfed.org/newsevents/-news/research/2026/20260210; *see also* Fed. Rsrv. Bank of N.Y., *Household Debt and Credit Report*, (February 2026) available at https://www.newyorkfed.org/medialibrary/interactives/householdcredit/-data/pdf/HHDC_2025Q4.

[46] Robert Adams et al., *A Note on Recent Dynamics of Consumer Delinquency Rates*, Bd. of Governors of the Fed. Rsrv. Sys. (Nov. 24, 2025), available at https://www.federalreserve.gov/econres/notes/feds-notes/a-note-on-recent-dynamics-of-consumer-delinquency-rates-20251124.html.

[47] *Does Klarna Perform a Credit Check and Will This Affect My Credit Score?*, *supra* note 10.

[48] CFPB 2022, supra note 11, at 65.

64. This kind of stacking is common. Approximately 32% of BNPL users have simultaneous loans with at least two providers.[49] Other research likewise found that a substantial share of BNPL users carried three, four, five, or more concurrent BNPL plans.[50]

## C. Klarna encourages over-indebtedness by design.

65. Klarna's business model is designed to *increase* consumer spending. It does that by giving financially strained consumers instant credit they often could not get through traditional underwriting, so they can make purchases they otherwise would not, and often could not, make.

66. Klarna's own marketing repeatedly touts those results. Klarna claims, for example, that merchants saw sales increases of 33% (Gymshark), 20% (Paul Valentine), 200% (Gravity), and 40% (Storets) after adopting Klarna.[51]

67. Klarna achieves those sales increases by giving consumers access to instant, reusable, and replenishable credit without a meaningful ability to repay analysis.

68. Klarna then protects its credit by securing repayment through autopay. Whether those consumers can actually afford the credit—and whether consumers will face overdraft fees, late fees, revolving debt, or other financial stress—is not a

---

[49] CFPB Jan. 2025, *supra* note 27, at 17.

[50] Consumer Reports, *supra* note 29, at 28.

[51] Klarna Deep Dive, *supra* note 6.

question Klarna asks, answers or even considers before extending or collecting on the debt.

69.     Klarna's exposure is further reduced because it has increasingly bundled and sold many of its BNPL products to third parties. So even when consumers predictably struggle to repay, Klarna can still originate the debt, generate a merchant fee, and shift the risk elsewhere.

## III. Regulators have questioned whether BNPL providers comply with existing consumer protection laws

70.     State and federal regulators have repeatedly expressed concern that BNPL providers extend credit without affording consumers the protections long required under federal consumer-finance law.

71.     In December 2021, the CFPB opened a formal inquiry into the BNPL industry by issuing market-monitoring orders to the five largest BNPL providers, including Klarna.[52] In January 2022, the CFPB expanded that inquiry by requesting public comment on BNPL products and their risks to consumers.

72.     One of the most significant comments came from the Illinois Attorney General, joined by 21 other state attorneys general. The coalition praised the CFPB's inquiry as an important "first step towards greater transparency and regulation of the industry."[53] At the same time, it warned that so-called innovative financial

---

[52] Consumer Fin. Prot. Bureau, *Consumer Financial Protection Bureau Opens Inquiry into Buy Now, Pay Later Credit* (Dec. 16, 2021), available at https://www.consumerfinance.gov/about-us/newsroom/consumer-financial-protection-bureau-opens-inquiry-into-buy-now-pay-later-credit/.

[53] *Comments of 21 State Attorneys General to CFPB Regarding the CFPB's Inquiry Into Buy-Now-Pay-Later Providers*, Docket No. CFPB-2022-0002 (Mar. 25, 2022), available at https://www.regulations.gov/comment/CFPB-2022-0002-0025.

products can "push consumers into cycles of debt" and may share "some of the same terms and features as other expensive and predatory financial products."[54] That concern was especially acute, the coalition explained, for "consumers who may already be struggling to make ends meet and to cover their existing debt burdens."[55]

73. The Illinois Attorney General further noted that his office has repeatedly acted against lenders that "prey on vulnerable borrowers through attempts to evade consumer credit laws."[56] He expressed concern that BNPL providers' promises of quick approvals, no credit checks, no interest or fees, and convenient payment schedules may be "masking features that will contribute to long-term damage to consumers' financial health."

74. The coalition began with a basic premise: "[r]egardless of what some BNPL providers and advocates may claim, BNPL financing is credit."[57] On that view, one of the coalition's principal concerns was that BNPL providers often fail to assess "a consumer's ability-to-repay prior to extending" credit.[58]

75. In particularly prescient terms, the Illinois Attorney General warned that the "lack of robust underwriting coupled with marketing that touts the ease of splitting the cost of goods or services into multiple payments without interest or fees, provides little protection against an unsustainable accumulation of debt—

---

[54] *Id.* at 1.

[55] *Id.*

[56] *Id.* at 2.

[57] *Id.* at 4.

[58] *Id.* at 4-5.

particularly for younger borrowers and consumers who already struggle to make ends meet or owe on other debts."[59] That is exactly what happened to many consumers.

76.     The coalition concluded that studies linking BNPL use to increased overdraft fees, missed payments, reduced credit access, and later financial distress "underscore[d] the need for BNPL providers to consider a consumer's ability to repay so that consumers do not overextend their finances."

77.     As the CFPB's inquiry progressed, the agency published a series of reports documenting the risks posed by BNPL products.

78.     In 2022, the CFPB published its *Buy Now, Pay Later: Market Trends and Consumer Impacts report*, which found that BNPL users were not "simply shifting their existing purchases to a new payment platform"; rather, "they may be spending (and borrowing) more than they otherwise would."[60] That finding is consistent with Klarna's own marketing materials, which tout BNPL's ability to increase consumer spending.

79.     The 2022 report also highlighted the risk of "loan stacking": because many BNPL providers rely only on soft credit checks, a consumer's BNPL obligations may remain invisible to other lenders.[61] That allows consumers to take on multiple overlapping BNPL plans from different providers, quickly worsening their financial condition.

---

[59] *Id.*

[60] CFPB 2022, *supra* note 11, at 64.

[61] *Id.* at 65-66.

80. The CFPB also identified the problem of "sustained usage," warning that the "habitual borrower" may have continual access to an often-increasing amount of BNPL credit.[62] That dynamic creates a substantial risk of over-indebtedness and can force consumers to forgo essentials.

81. In March 2023, the CFPB issued another report examining who uses BNPL products.[63] Its findings again pointed to a troubling pattern: BNPL usage was concentrated among financially vulnerable consumers.

82. The CFPB's regulatory efforts culminated in May 2024, when it issued an interpretive rule concluding that many BNPL lenders using digital user accounts function as "card issuers" under the Truth in Lending Act and therefore must comply with key provisions of Regulation Z.[64] The rule was expressly limited to traditional pay-in-four BNPL products, not longer-term interest-bearing installment plans.[65]

83. Following the change in administration, however, the CFPB announced that it "will not prioritize enforcement actions" based on that interpretive rule.[66]

---

[62] *Id*. at 66-69.

[63] CFPB 2023, *supra* note 30.

[64] Consumer Fin. Prot. Bureau, *Use of Digital User Accounts to Access Buy Now, Pay Later Loans* (May 22, 2024) ("CFPB Interpretative Rule"), available at https://www.consumerfinance.gov/rules-policy/final-rules/use-of-digital-user-accounts-to-access-buy-now-pay-later-loans/.

[65] *Id*. at 4 ("While variations of the product exist, for this interpretive rule, BNPL refers to a consumer loan for a retail transaction that is repaid in four (or fewer) interest-free installments and does not otherwise impose a finance charge.")

[66] Consumer Fin. Prot. Bureau*, CFPB Announcement Regarding Enforcement Actions Related to Buy Now, Pay Later Loans* (May 6, 2025), available at https://www.consumerfinance.gov/about-us/newsroom/cfpb-announcement-regarding-enforcement-actions-related-to-buy-now-pay-later-loans/.

84. As federal enforcement receded, however, a new coalition of seven attorneys general—including the Illinois Attorney General—undertook its own inquiry into the BNPL industry.[67] Echoing the CFPB's earlier concerns, the coalition sought information from Klarna regarding, among other things, how it assesses consumers' ability to repay, how it furnishes information to credit bureaus, how it processes payments, the number of delinquencies and defaults associated with its products, and the terms of its merchant agreements.[68] The coalition also specifically asked about "any efforts you have made to comply with Subpart B" of TILA—the portion of Regulation Z governing open-end credit, including ability-to-repay requirements.[69]

## IV. Federal guardrails exist to protect consumers which Klarna deliberately sidesteps.

85. Klarna's credit products are already subject to existing law, as the CFPB's interpretive rule recognized. But that rule did not go far enough because it was expressly limited to "a consumer loan for a retail transaction that is repaid in four (or fewer) interest-free installments and does not otherwise impose a finance charge."

86. Klarna, however, also offers longer-term credit products that do impose interest—and therefore finance charges. As the CFPB acknowledged, "such loans

---

[67] *Letter from Multistate Coalition of State Attorneys General to Klarna, Re: Buy Now, Pay Later* (Dec. 1, 2025), available at https://illinoisattorneygeneral.gov/news/story/attorney-general-raoul-launches-inquiry-into-buy-now-pay-later-lenders.

[68] *Id.* at 2.

[69] *Id.* at 3.

might be subject to other provisions of Regulation Z[.]" That is the case here. Klarna's longer-term "Fair Financing" products charge interest and provide revolving, replenishable credit, subjecting them to the TILA's ability to repay requirement. Klarna's failure to comply with that requirement has predictably led to the very harms Congress sought to prevent: overspending and over-indebtedness.

87.    Klarna also requires—for many of its credit products—that consumers authorize automatic withdrawals as a condition of obtaining credit. That practice violates EFTA's prohibition on conditioning credit on mandatory autopay and creates the kind of predictable consumer harm Congress enacted the statute to prevent.

## A. Klarna improperly conditions access to credit on mandatory autopay.

88.    Federal credit law "is mindful that consumers should have choice when they decide if and how to make payments on outstanding debts."[70] That principle is codified in the EFTA's prohibition on compulsory autopay, which bars any person from conditioning the extension of credit on a consumer's agreement to repay by preauthorized electronic fund transfer:

> No person may… condition the extension of credit to a consumer on such consumer's repayment by means of preauthorized electronic fund transfers[.][71]

89.    Congress enacted this rule to preserve consumers' ability to "prioritize repayment of debts" as necessary.[72] This is particularly important in emergencies

---

[70] CFPB 2022, *supra* note 11, at 73.

[71] 15 U.S.C. § 1693k(1).

[72] Consumer Fin. Prot. Bureau, *Prepaid Accounts Under the Electronic Fund Transfer Act (Regulation E) and the Truth in Lending Act (Regulation Z)*, (Nov. 22, 2016), at 168, available at

when, for example, a consumer must choose between repaying a BNPL installment or putting food on the table.

90. This protection is even more important in the context of BNPL credit because BNPL consumers are disproportionately financially distressed.

91. The statutory definitions bring Klarna's BNPL products—particularly its "Pay in 4" products—squarely within this prohibition. "Credit" includes the right to "defer payment of debt, incur debt and defer its payment, or purchase property or services and defer payment therefor."[73]

92. An "electronic fund transfer" includes any transfer initiated electronically "for the purpose of . . . authorizing a financial institution to debit or credit a consumer's account."[74]

93. Klarna's "Pay in 4" products satisfy both definitions: they allow consumers to receive goods while deferring a debt, and Klarna collects those installments via preauthorized debits to the consumer's bank account or card.[75]

94. For many transactions, "Pay in 4" is the only credit product Klarna offers. In other words, to receive credit from Klarna, the consumer must agree to autopay. That is a violation of the EFTA's prohibition on compulsory autopay.

---

https://www.consumerfinance.gov/rules-policy/final-rules/prepaid-accounts-under-electronic-fund-transfer-act-regulation-e-and-truth-lending-act-regulation-z/.

[73] 12 C.F.R. § 1005.2(f).

[74] 12 C.F.R. § 1005.3(b)(1).

[75] Exhibit A, Klarna Pay in 4 Agreement ("You must agree to… the Payment Authorization below that authorizes us to initiate payments from the debit card, credit card, or bank account you have identified, in order to obtain a Pay in 4 loan.").

95.     This is not a fringe practice. One study found that approximately 69% of BNPL transactions involve autopay.[76] Indeed, in many instances Klarna offers only its "Pay in 4" product, which requires autopay:



96.     The frequency with which Klarna offers only "Pay in 4"—and how often it makes autopay mandatory—varies by merchant, depending on the underlying agreement between the merchant and Klarna.

97.     Regardless of how prevalent the "Pay in 4" practice is, when Klarna conditions access to credit on autopay, it violates the EFTA's prohibition on compulsory autopay.

---

[76] Consumer Reports, *supra* note 29, at 21.

**B. Klarna fails to consider a consumer's ability to repay before issuing open-end credit.**

98. The TILA was originally enacted to impose basic safeguards in consumer lending. In 2009, Congress strengthened those safeguards through the Credit CARD Act. Among other things, the Credit CARD Act requires card issuers to consider a consumer's ability to repay before opening an open-end credit account or increasing the credit limit on such an account.[77]

99. That ability to repay determination must be "based on the consumer's income or assets and the consumer's current obligations."[78] Income or assets includes current or reasonably expected income, such as salary, wages, bonus pay, tips, and commissions.[79]

100. Klarna's "low-and-grow" purchasing-power model disregards that requirement. Klarna gives consumers immediate access to reusable, replenishable credit and increases that credit over time without conducting the ability-to-repay analysis that TILA requires.

101. Klarna assigns purchasing power automatically when a consumer creates an account. It does not assess the consumer's existing debts, and it does not determine—indeed, it does not care—how much the consumer earns.

---

[77] 15 U.S.C. § 1665e; 12 C.F.R. § 1026.51(a)(1)(i).

[78] 12 C.F.R. § 1026.51(a)(1)(i).

[79] Consumer Fin. Prot. Bureau, *Official Interpretations to Regulation Z § 1026.51*, at 4.ii, available at https://www.consumerfinance.gov/rules-policy/regulations/1026/interp-51/.

102. Instead, Klarna's underwriting relies on "purchase behavior from an average of approximately 2.9 million transactions per day made by 93 million active Klarna consumers[.]"[80] And when Klarna increases a consumer's purchasing power, it does not assess the consumer's income, assets, or current obligations. Instead, it considers "factors such as [the consumer's] payment history with Klarna and [their] outstanding balance."[81]

103. And there is little doubt that TILA's ability to repay requirement applies to Klarna. The rule is direct: a card issuer may not open an open-end consumer credit account, or increase the credit limit on that account, unless it considers the consumer's ability to make the required payments based on the consumer's income or assets and current obligations:

> **(i)** **Consideration of ability to pay**. A card issuer must not open a credit card account for a consumer under an open-end (not home-secured) consumer credit plan, or increase any credit limit applicable to such account, unless the card issuer considers the consumer's ability to make the required minimum periodic payments under the terms of the account based on the consumer's income or assets and the consumer's current obligations.[82]

104. After studying the BNPL industry for several years, the CFPB persuasively concluded that traditional, interest-free "Pay in 4" BNPL products are "credit cards" for purposes of TILA and that BNPL providers are "card issuers."[83]

---

[80] Klarna F-1, *supra* note 1, at 138.

[81] Klarna, *How Much Am I Eligible to Spend?*, supra note 13.

[82] 12 C.F.R. § 1026.51(a)(1)(i).

[83] CFPB Interpretative Rule, *supra* note 64. This interpretative rule did not address whether Klarna's BNPL products are open-end credit because it was expressly limited to interest-free Pay in 4 products. *Id.* at 4 ("BNPL refers to a consumer loan for a retail transaction that is repaid in four (or fewer)

105. TILA defines a "card issuer" as "a person that issues a credit card."[84] And TILA defines "credit card" broadly to mean "any card, plate, or ***other single credit device*** that may be used from time to time to obtain credit."[85] That definition is not limited to a plastic card.[86] It expressly includes any "other credit device" used to obtain money, property, labor, or services on credit.[87]

106. This is precisely what Klarna provides. As the CFPB explained, the digital accounts BNPL providers issue to consumers to access credit "mimic[] conventional credit cards" because they allow consumers to obtain credit from time to time to purchase goods and services.[88] Klarna's digital account and purchasing-power system functions as the kind of reusable "credit device" contemplated by TILA.[89]

107. Klarna's credit also meets TILA's definition of open-end credit. Open-end credit exists where: (i) the creditor reasonably contemplates repeated transactions; (ii) the creditor may impose a finance charge from time to time on an

---

interest-free installments and does not otherwise impose a finance charge."). And the CFPB made clear that other BNPL products—including interest bearing products like Klarna's "Fair Financing"— "might be subject to other provisions of Regulation Z" depending on their features. *Id*. at 4, n.4.

[84] 12 C.F.R. § 1026.2(a)(7).

[85] 12 C.F.R. § 1026.2(a)(15)(i).

[86] CFPB Interpretive Rule, *supra* note 64, at 10.

[87] 15 U.S.C. 1602(l).

[88] CFPB Interpretive Rule, *supra* note 64, at 10.

[89] *Id*. at 13-14.

outstanding unpaid balance; and (iii) credit is generally replenishable as balances are repaid.[90]

108. Klarna "low-and-grow" lending strategy plainly contemplates repeated transactions. That inquiry is objective and turns on whether the creditor's plan is structured for repeat use.[91] Klarna users immediately receive a small purchasing power, they may continue to draw on that credit as they repay, and are granted more purchasing power over time if they remain current with their Klarna obligations.[92]

109. Klarna also may impose finance charges from time to time. All of Klarna's "Fair Financing" products charge interest.[93] And Klarna's own public filings confirm that a substantial portion of its revenue comes from interest-bearing credit products.[94]

110. There is no legitimate dispute that Klarna's credit is replenishable. Klarna assigns consumers a spending capacity—called a "purchasing power"—that becomes available again as prior balances are repaid. In other words, as consumers

---

[90] 12 C.F.R. § 1026.2(20).

[91] Consumer Fin. Prot. Bureau, *Official Interpretations to Regulation Z § 1026.2(a)(20)*, available at https://www.consumerfinance.gov/rules-policy/regulations/1026/interp-2/#2-a-18-Interp-2-i-B.

[92] CFPB Jan. 2025, *supra* note 27, at 3, 7, 18-19.

[93] The fact that some Klarna products—particularly Pay in 4—may be interest-free does not change that conclusion. TILA and Regulation Z recognize that a creditor may offer programs with "a number of different credit features[.]" As the CFPB explained, if the program as a whole "otherwise meets the definition of open-end credit, it may be treated as a single, multi-featured plan." Consumer Fin. Prot. Bureau, *Official Interpretations to Regulation Z § 1026.2(a)(20)*, at 2.iii. Klarna's credit program includes products that carry finance charges. That is enough to satisfy this element.

[94] Klarna F-1, *supra* note 1, at 5, 47.

pay down Klarna debt, Klarna restores (and often increases) the amount of credit available for future use.

111. The CFPB's BNPL guidance reinforces that point. The defining feature of a credit card is a credit device that may be used "from time to time," and the CFPB found that BNPL providers are designed around repeat use of a digital account to make real-time purchases on credit.[95] The fact that a particular transaction may sometimes be declined does not alter the nature of the plan; conventional credit cards also decline transactions from time to time.

## PLAINTIFFS' EXPERIENCES

### I. Birgetta Clay's Experiences.

112. Plaintiff Birgetta Clay is retired and lives on a fixed income from Social Security. She is also the primary caregiver for her two grandchildren following the death of her daughter. She manages the household, covers the family's day-to-day needs, and makes sure her grandchildren are cared for.

113. Birgetta also carries existing debt, including approximately $7,000 in auto-loan debt and approximately $300 in credit-card debt. Like many consumers on a fixed income, she must budget carefully and decide which obligations get paid, and when.

114. Birgetta began using Klarna in or around 2020. When she opened her account, Klarna immediately assigned her a modest amount of "purchasing power,"

---

[95] CFPB Interpretive Rule, *supra* note 64, at 8-15 ("Like conventional credit cards, the BNPL business model is designed around the repeat use of a digital user account to make real-time purchases on credit.").

which Klarna then increased or decreased based on her repayment history. Klarna did so without asking Birgetta for any information about her income.

115. As of March 23, 2026, Birgetta currently has approximately $165.15 in outstanding Klarna debt.

116. Since joining Klarna in 2020, Birgetta has become a heavy user of the platform, completing well over 100 transactions. Over that period, Klarna repeatedly extended her credit and continued to approve additional purchases while she was living on a fixed income and managing other debt obligations.

117. Most of Birgetta's Klarna transactions have been through Klarna's "Pay in 4" product. For many purchases, Klarna presented "Pay in 4" as the only available payment option, including, for example, purchases made from Macy's. Birgetta also incurred interest-bearing debt through Klarna's "Fair Financing" credit products on several purchases.

118. On several occasions, Klarna initiated automatic withdrawals from Birgetta's account even though her available balance was not enough to cover the payment and her other household expenses, resulting in late fees of $7. Birgetta could not disable Klarna's autopay withdrawal through the app or postpone it while she addressed more immediate obligations.

119. Klarna's practices caused Birgetta concrete harm. Klarna repeatedly extended her credit, including through "Pay in 4" and "Fair Financing," and then used mandatory automatic withdrawals to collect from the same account she relied on to support herself and her grandchildren. That deprived her of the ability to control the

31

timing and priority of payments when money was tight. As a result, she was at times unable to make timely payments on other essential obligations, including her auto loan, and fell behind when Klarna's withdrawals depleted funds she needed for those payments.

## II. Candice McIntrye's Experiences

120. Plaintiff Candice McIntyre is employed in a data entry position and earns minimum wage. She is also the mother of three children and is responsible for managing household expenses and day-to-day family needs.

121. Candice also carries significant debt obligations. She has substantial student-loan debt, which is currently in forbearance, and high credit-card debt that she has been unable to pay off. Like many working consumers, she must budget carefully and prioritize which obligations can be paid as funds become available.

122. Candice began using Klarna in or around 2020. When she opened her account, Klarna immediately assigned her a modest amount of "purchasing power," which Klarna then increased or decreased based on her repayment history. Klarna did so without asking Candice for any information about her income.

123. As of March 23, 2026, Candice's "purchasing power" is approximately $375, and she has $163.58 in outstanding Klarna debt.

124. Since joining Klarna in 2020, Candice has become a heavy user of the platform, completing more than 50 transactions. Over that period, Klarna repeatedly extended her credit and continued to approve additional purchases while she was living on a limited income and managing other debt obligations.

125. Most of Candice's Klarna transactions have been through Klarna's "Pay in 4" product. For many purchases, Klarna presented "Pay in 4" as the only available payment option, including, for example, purchases made through Rainbow Shops and Macy's. Candice also incurred interest-bearing debt through Klarna's "Fair Financing" credit products on several purchases.

126. For Candice's "Pay in 4" transactions, Klarna required automatic payments. Klarna did not allow Candice to disable those automatic payments through the app. As a result, when a Klarna payment came due, Candice could not control the timing of the withdrawal or delay payment through the app in order to address other household obligations first.

127. Candice missed Klarna payments on several occasions. For example, on or about May 23, 2025, Klarna initiated an automatic withdrawal of approximately $13.02. That payment failed, as Birgetta could not disable the autopay withdrawal through the app or postpone it while she addressed more immediate obligations.

128. Klarna also charged Candice late fees when she missed scheduled payments. For example, after Candice missed a payment due on or about May 23, 2025, Klarna assessed a late fee of approximately $7. Klarna imposed similar late fees on other occasions, adding to the cost of purchases that Candice had already financed through Klarna. These charges increased her debt and made it harder for her to catch up once she fell behind.

129. Klarna's practices caused Candice concrete harm. Klarna repeatedly extended her credit and then used mandatory automatic withdrawals to collect from

the same account she relied on for wages and household expenses. That deprived Candice of the ability to control the timing and priority of payments when funds were limited and increased the cost of credit through late fees when she could not keep pace with Klarna's payment schedule.

## CLASS ALLEGATIONS

130. Plaintiffs bring this action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of themselves and all other similarly situated individuals (the "Class"), defined as follows:

> All persons in the United States who, during the applicable limitations period, obtain consumer credit from Klarna.

131. Excluded from the Class are any of Defendant's officers, directors, or employees; officers, directors, or employees of any entity in which Defendant currently has or has had a controlling interest; and Defendant's legal representatives, heirs, successors, and assigns.

132. A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

133. At this time, Plaintiffs do not know the exact number of Class members. But given the nature of Klarna's business, its nationwide use, and the standardized terms and checkout flow used to extend credit to consumers, the Class is unquestionably so numerous that joinder of all members is impracticable.

134. There is a well-defined community of interest in the questions of law and fact involved in this case. The following questions of law and fact are common to

the Class members and predominate over questions that may affect individual Class members, including:

    a. Whether Klarna conditioned the extension of credit on consumers' agreement to repay by preauthorized electronic fund transfer;

    b. Whether Klarna extends open-end credit through its "purchasing power" credit allotment;

    c. Whether Klarna conducts a legally sufficient ability-to-repay assessment;

    d. Whether Klarna was unjustly enriched as a result of the unlawful, unfair, and/or deceptive conduct alleged in this Complaint such that it would be inequitable for Klarna to retain the benefits conferred by Plaintiff and the other Class members; and

    e. Whether Plaintiff and Class members are entitled to monetary damages, statutory damages, restitution, injunctive relief, declaratory relief, and/or other appropriate relief, and if so, the proper measure of that relief.

135. Plaintiffs' claims are typical of those of the Class because Plaintiffs, like all Class members, obtained Klarna consumer credit in a typical consumer transaction, were subject to Klarna's standardized terms and payment practices, and were injured by the same unlawful conduct alleged herein.

136. Plaintiffs will fairly and adequately protect the interests of the Class and has retained counsel experienced in litigating complex class actions and consumer-protection matters. Plaintiffs have no interests antagonistic to, or in conflict with, the interests of the Class.

137. The requirements of Fed. R. Civ. P. 23(b)(3) are satisfied because common questions of law and fact predominate over any individual questions, and a

class action is superior to other available methods for fairly and efficiently adjudicating this controversy.

138. The requirements of Fed. R. Civ. P. 23(b)(2) are also satisfied because Klarna has acted or refused to act on grounds that apply generally to the Class, making final injunctive and declaratory relief appropriate with respect to the Class as a whole.

139. Klarna's conduct is generally applicable to the Class as a whole because the challenged practices arise from uniform policies, standardized agreements, and common payment-authorization and credit-extension procedures. Plaintiff therefore seeks declaratory and injunctive relief that is appropriate for the Class as a whole.

140. The litigation of separate actions by individual Class members would create a risk of inconsistent or incompatible rulings and standards of conduct for Klarna. For example, one court could hold Klarna's challenged payment-authorization and credit-extension practices unlawful and enjoin them, while another court could decline to do so. Individual actions may also, as a practical matter, be dispositive of the interests of absent Class members or substantially impair their ability to protect their interests.

141. Plaintiffs and the other Class members have suffered damages and other harm as a result of Klarna's unlawful and wrongful conduct. Absent a class action, Klarna will retain substantial monies obtained through its challenged practices, and that conduct likely will continue without effective remedy. Further, absent a class action, most Class members would be unable to vindicate their rights

individually because the cost of litigating these claims would far exceed any individual recovery.

**FIRST CAUSE OF ACTION**
**Violations of the Electronic Fund Transfer Act,**
**15 U.S.C. § 1693 *et seq.*, and 12 C.F.R. § 1005 *et seq.***

142. Plaintiffs incorporate by reference all of the above paragraphs, as though fully set forth herein.

143. The Electronic Fund Transfer Act and its implementing regulations (Regulation E) prohibits conditioning the extension of credit on a consumer's repayment by preauthorized electronic fund transfer. 15 U.S.C. § 1693k(1); 12 C.F.R. § 1005.10(e)(1).

144. A "preauthorized electronic fund transfer" is an electronic fund transfer authorized in advance to recur at substantially regular intervals. 15 U.S.C. § 1693a(10).

145. An "electronic fund transfer" is any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape to instruct or authorize a financial institution to debit or credit an account. 15 U.S.C. § 1693a(7).

146. "Credit" means the right granted by a financial institution to a consumer to defer payment of debt, incur debt and defer its payment, or purchase property or services and defer payment therefor. 12 C.F.R. § 1005.2(f).

147. Klarna extends credit within the meaning of the EFTA and Regulation E. Klarna allows consumers to obtain goods immediately and repay Klarna later, including through its "Pay in 4" product.

37

148. To use Klarna's "Pay in 4" product, Klarna requires consumers to authorize automatic withdrawals from a bank account or debit card as a condition of receiving credit. Those withdrawals are scheduled in advance and recur on regular payment dates.

149. Those withdrawals are preauthorized electronic fund transfers within the meaning of the EFTA. 15 U.S.C. § 1693a(10).

150. For many transactions, Klarna offers consumers only "Pay in 4." In those transactions, consumers cannot obtain Klarna credit unless they agree in advance to repayment by automatic withdrawal. The availability of repayment options varies by merchant integration and Klarna's merchant agreements.

151. This is exactly how Klarna extended credit to Plaintiffs. Birgetta Clay and Candice McIntyre each used Klarna's "Pay in 4" product repeatedly, and for many transactions—including transactions where "Pay in 4" was the only option presented—Klarna required advance authorization for automatic withdrawals as a condition of obtaining credit.

152. Klarna did not allow Plaintiffs to disable those automatic withdrawals through the app for "Pay in 4" transactions. Once the payment schedule was set, Klarna initiated withdrawals automatically on scheduled due dates from the same accounts Plaintiffs relied on for household expenses.

153. Klarna's mandatory automatic-withdrawal practice caused concrete harm to Plaintiffs. Birgetta Clay incurred overdraft fees when Klarna initiated automatic withdrawals despite insufficient funds, and both Plaintiffs were charged

late fees after falling behind on Klarna payment schedules. Plaintiffs also lost the ability to control the timing and priority of payments when funds were limited.

154. Klarna's conduct violates the EFTA and Regulation E by conditioning the extension of credit on repayment by preauthorized electronic fund transfer. 15 U.S.C. § 1693k(1); 12 C.F.R. § 1005.10(e)(1).

155. As a result of Klarna's unlawful conduct, Plaintiffs and Class members have suffered injury, including loss of payment choice, overdraft and insufficient-funds fees, late fees, and other financial harm, and are entitled to all available legal and equitable relief.

**SECOND CAUSE OF ACTION**
**Violations of the Truth in Lending Act,**
**15 U.S.C. § 1601 *et seq.*, and 12 C.F.R. § 1026 *et seq.***

156. Plaintiffs incorporate by reference all of the above paragraphs, as though fully set forth herein.

157. The Truth in Lending Act prohibits a card issuer from opening a credit card account under an open-end consumer credit plan, or increasing the credit limit on such an account, unless the issuer considers the consumer's ability to make the required payments under the account terms. 15 U.S.C. § 1665e; 12 C.F.R. § 1026.51(a)(1)(i).

158. Klarna is a "card issuer" because it issues a "credit card" within the meaning of Regulation Z. *See* 12 C.F.R. § 1026.2(a)(7). Regulation Z defines "credit card" broadly to include "any card, plate, or ***other single credit device*** that may be used from time to time to obtain credit." 12 C.F.R. § 1026.2(a)(15)(i) (emphasis added). The term is not limited to a physical card; it includes digital and other non-physical

39

credit devices used to obtain goods or services on credit. *See* 15 U.S.C. § 1602(l); CFPB, *Use of Digital User Accounts to Access Buy Now, Pay Later Loans*, Interpretive Rule, at 10 (2024).

159. Klarna extends "open-end credit." Klarna reasonably contemplates repeated transactions, imposes a finance charge from time to time, and extends credit under a plan which is generally available and replenished as the consumer repays outstanding balances. *See* 12 C.F.R. § 1026.2(a)(20).

160. Klarna grants consumers reusable "purchasing power" and encourages repeat use through a digital account. As consumers repay outstanding balances, that purchasing power is restored and made available for new transactions. That is open-end credit.

161. That is how Klarna operated for Plaintiffs. Birgetta Clay and Candice McIntyre each opened Klarna accounts, were assigned initial "purchasing power," and then used Klarna repeatedly over time to finance purchases. Klarna adjusted their available purchasing power based on repayment history and continued extending credit through the same digital account. Birgetta completed well over 100 Klarna transactions; Candice completed at least 50.

162. Klarna's marketing materials characterize its credit model as underwriting each transaction individually. But the relevant question is not whether Klarna sometimes declines a transaction. Credit cards do that too. The relevant question is whether Klarna extends replenishable credit through a device that consumers use repeatedly over time. It does. *See* CFPB 2024 Interpretive Rule at 14

& n.50. As the CFPB has explained, the BNPL model is "designed around the repeat use of a digital user account to make real-time purchases on credit." *Id.* at 14.

163. And in practice, Klarna's "underwriting" is little more than a check of whether the consumer is current on existing Klarna obligations. As counsel's investigation confirmed, consumers may continue spending up to their available purchasing power so long as they remain current with Klarna, and that purchasing power replenishes as prior balances are repaid.

164. This is exactly how Klarna's purchasing power operated with Plaintiffs. Klarna repeatedly approved their transactions and adjusted purchasing power over time so long as they were current with their existing Klarna obligations.

165. Klarna is therefore subject to TILA's ability-to-repay requirement, including when it opens a consumer's account and when it increases the amount of credit available to that consumer. 15 U.S.C. § 1665e; 12 C.F.R. § 1026.51(a)(1)(i).

166. Klarna does not comply with that requirement. Klarna's "low-and-grow" strategy automatically extends an initial purchasing power to consumers without considering their ability to repay. Klarna does not assess income, existing debt obligations, or whether the consumer can make required payments while meeting other financial obligations.

167. Plaintiffs' experiences illustrate that failure. Klarna assigned Birgetta Clay and Candice McIntyre purchasing power and repeatedly extended additional credit through their Klarna accounts, even though Birgetta lived on fixed Social Security income while supporting her grandchildren and managing existing debt, and

Candice worked a minimum-wage job and struggled to pay existing debt. Klarna never asked Plaintiffs their income, but it increased or adjusted their available credit based on their repayment behavior within Klarna's system, not on any meaningful assessment of their ability to repay additional debt without financial harm.

168. Instead, Klarna determines purchasing power based on behavioral and transactional data—by its own description, using purchase behavior derived from millions of transactions across its user base—rather than a consumer-specific ability-to-repay analysis. *See* Klarna F-1 at 138.

169. Klarna likewise increases available credit without the analysis TILA requires. Klarna states that spending eligibility may be affected by factors such as a consumer's payment history with Klarna and outstanding Klarna balance—not by a meaningful assessment of income, assets, or overall debt obligations. In other words, Klarna ties increased credit to prior repayment performance within Klarna's own system, not to the consumer's ability to repay additional debt. That is not what TILA permits.

170. The problem is compounded by Klarna's payment practices. Where Klarna requires preauthorized payments, repayment performance reflects contractual priority over consumer funds—not a lawful ability-to-repay determination. Klarna then uses that repayment history to increase available credit, further untethering credit extension from the consumer's actual financial capacity.

171. Plaintiffs' experiences reflect that compounding harm. Klarna's payment practices and repeat-extension model exposed Plaintiffs to late fees,

overdraft or insufficient-funds charges, and loss of control over payment timing, while Klarna continued to use their repayment history to determine future spending eligibility and available purchasing power.

172. Klarna's conduct violates the Truth in Lending Act and Regulation Z, including 15 U.S.C. § 1665e and 12 C.F.R. § 1026.51(a)(1)(i).

### THIRD CAUSE OF ACTION
### Violations of the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/1 *et seq.*

173. Plaintiffs incorporate by reference all of the above paragraphs, as though fully set forth herein.

174. The Illinois Consumer Fraud and Deceptive Business Practices Act ("ICFA") prohibits unfair acts or practices in the conduct of trade or commerce. 815 ILCS 505/2.

175. Klarna's practices are unfair because they require consumers, for many "Pay in 4" transactions, to authorize recurring automatic withdrawals as a condition of receiving credit. As alleged above, Klarna conditions the extension of credit on repayment by preauthorized electronic fund transfer, including by offering "Pay in 4" as the only option for many transactions and requiring autopay for that product. That practice violates the Electronic Fund Transfer Act and Regulation E and is independently unfair under the ICFA.

176. Klarna's practices are also unfair because Klarna offers and increases access to open-end credit through its "purchasing power" system without conducting the ability to repay analysis required by the Truth in Lending Act and Regulation Z.

43

Klarna assigns consumers initial purchasing power, adjusts that amount over time, and repeatedly extends credit through the same digital account based on repayment behavior within Klarna's system rather than a meaningful, consumer-specific assessment of the consumer's ability to make required payments while meeting other obligations.

177. Klarna's practices are further unfair because Klarna provides consumers with immediate, reusable, and replenishable credit in a manner designed to increase spending, while failing to evaluate whether the consumer can reasonably repay that debt. Klarna's own "low-and-grow" model assigns initial spending capacity and then increases or decreases it based on platform usage and repayment history. In practice, Klarna self-admittedly uses that model to promote repeated borrowing and increased spending without a meaningful assessment of whether the consumer can sustain additional debt.

178. Plaintiffs were directly and proximately injured by Klarna's unfair conduct. As alleged above, Klarna repeatedly extended credit to Plaintiffs through a reusable "purchasing power" model, required automatic withdrawals for many transactions, and imposed fees when Plaintiffs fell behind. Birgetta Clay incurred overdraft fees and late fees, and Candice McIntyre incurred late fees and related financial harm, as a result of Klarna's payment and credit-extension practices.

179. Klarna's conduct violates the ICFA, 815 ILCS 505/1 et seq. Plaintiffs and the Illinois Class are entitled to actual damages, injunctive relief, attorneys' fees and costs, and all other relief available under law.

180. Klarna engaged in unfair and deceptive acts and practices in trade or commerce by marketing and extending consumer credit through its BNPL platform while, among other things, conditioning credit on mandatory automatic withdrawals for "Pay in 4" transactions, assigning and increasing consumers' "purchasing power" without a meaningful ability-to-repay assessment, and failing to adequately disclose or fairly present the material consequences of its repayment and fee practices.

181. Klarna's conduct was also unfair. Klarna's practices caused substantial injury to consumers, including Plaintiffs, by depriving them of control over the timing and priority of payments, exposing them to late fees and overdraft or insufficient-funds charges, and increasing the risk that they would fall behind on other essential obligations. These injuries were not reasonably avoidable where Klarna required automatic withdrawals for "Pay in 4" transactions and did not permit consumers to disable autopay through the app. Any purported benefits of Klarna's practices do not outweigh the harm to consumers.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, individually and on behalf of all others similarly situated, respectfully request that the Court enter judgment in their favor and against Defendant Klarna, and grant the following relief:

    a. An order certifying this action as a class action pursuant to Rule 23, appointing Plaintiffs as Class Representatives, and appointing Plaintiffs' undersigned counsel as Class Counsel;

    b. A declaration that Klarna's acts and practices alleged violate the Electronic Fund Transfer Act, the Truth in Lending Act, the Illinois Consumer Fraud and Deceptive Business Practices Act, and other applicable law;

c. Injunctive relief prohibiting Klarna from continuing the unlawful acts and practices alleged herein, including conditioning the extension of credit on preauthorized electronic fund transfers and extending replenishable consumer credit without the ability-to-repay review required by law;

d. An award of actual damages to Plaintiffs and Class members in an amount to be proven at trial;

e. An award of statutory damages to Plaintiffs and Class members to the maximum extent permitted by law;

f. An award of reasonable attorneys' fees, costs, and expenses, including expert fees where recoverable, and pre- and post-judgment interest as permitted by law; and

g. Such other and further legal, equitable, and declaratory relief as the Court deems just and proper.

## JURY TRIAL DEMANDED

Plaintiffs demand a trial by jury for all claims so triable.

DATED: March 30, 2026                    **STEPHAN ZOURAS, LLC**


By: ___/s/___ *Justin M. Caparco*_____
COUNSEL FOR PLAINTIFFS AND THE PUTATIVE CLASS

**STEPHAN ZOURAS, LLC**
James B. Zouras
Ryan F. Stephan
Justin M. Caparco
STEPHAN ZOURAS, LLC
222 West Adams Street, Suite 2020
Chicago, Illinois 60606
Telephone: (312) 233-1550
jzouras@stephanzouras.com
rstephan@stephanzouras.com
jcaparco@stephanzouras.com